UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
:
IN RE: TERM COMMODITIES COTTON :
FUTURES LITIGATION, :
:
:
THIS DOCUMENT RELATES TO ALL :
MEMBER CASES OF THIS ACTION: :
: MASTER DOCKET
:
12 Civ. 5126 : 12 Civ. 5126 (ALC)(KNF)
12 Civ. 5269 :
12 Civ. 5334 : **MEMORANDUM &**
12 Civ. 5380 : **ORDER**
12 Civ. 5470 :
12 Civ. 5563 :
12 Civ. 5732 :
:
:
:
------------------------------------------------------------------ X



ANDREW L. CARTER, JR., District Judge:

I.   Introduction

Plaintiffs brought these consolidated, proposed class actions after losing money when prices in the cotton futures market increased unexpectedly in 2011. Plaintiffs claim Defendants unlawfully manipulated the price of cotton futures by unreasonably and uneconomically demanding delivery of certificated cotton in fulfillment of futures contracts in conjunction with other manipulative behavior in violation of the Commodities Exchange Act ("CEA") and the Sherman Act. On December 20, 2013, this Court issued a Memorandum & Order granting in-part and denying in-part Defendants' Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants now move for reconsideration of the December 20 Memorandum & Order, arguing the Court erred in upholding the CEA and Sherman Act claims.

1

## II. Discussion

The facts of this case were fully set forth in the December 20 Memorandum & Order, and the Court assumes familiarity therewith.

Defendants' assert the December 20 Memorandum & Order contained the following errors as the basis of their reconsideration motion: (1) Plaintiffs' allegations did not state a claim under § 1 of the Sherman Act because Defendants are incapable of conspiring with themselves as a matter of law; (2) Plaintiffs' allegations make clear the only basis for antitrust injury is predatory overbidding under § 2 of the Sherman Act, which is subject to the pleading requirements of Weyerhaeuser v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312 (2007); and (3) Plaintiffs failed to plead allegations in support of the CEA manipulation claim that demonstrate: (i) Defendants knew there was a shortage of cotton when they purchased their long positions, and (ii) shorts were unable to make delivery with prudent planning. In addition, Defendants claim In re Commodity Exch., Inc. Silver Futures & Options Trading Litigation, 560 F. App'x 84 (2014), decided by the United States Court of Appeals for the Second Circuit after the December 20 Memorandum & Order, and a Report from the U.S. Commodity Futures Trading Commission warrant reconsideration.

### A. *Standard of Review*

Local Rule 6.3 provides the standard for a motion for reconsideration. This District has repeatedly stated, "Local Rule 6.3 'should be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court.'" Word v. Croce, No. 00 Civ. 6496 (SAS), 2001 WL 755394, at *3 (S.D.N.Y. July 5, 2001) (quoting Dellefave v. Access Temps., Inc., No. 99 Civ. 6098 (RWS), 2001 WL 286771, at *1 (S.D.N.Y.

2

Mar. 22, 2001)). To be successful on a motion for reconsideration, the movant must "demonstrate controlling law or factual matters put before the court in its decision on the underlying matter that the movant believes the court overlooked and that might reasonably be expected to alter the conclusion reached by the court." Glory Wealth Shipping Serv. Ltd. v. Five Ocean Corp. Ltd., 571 F. Supp. 2d 542, 544 (S.D.N.Y. 2008); see also Montanile v. Nat'l Broad. Co., 216 F. Supp. 2d 341, 342 (S.D.N.Y. 2002) ("Reconsideration may be granted to correct clear error, prevent manifest injustice or review the court's decision in light of the availability of new evidence."). The motion will be denied if "the moving party seeks solely to relitigate an issue already decided." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).

**B.** *CEA Manipulation Claim*

Although the Court conducted a lengthy analysis of the CEA manipulation claim, Defendants assert that analysis was flawed in two respects. First, Defendants claim the Court overlooked controlling decisions finding that in alleging manipulation through market congestion, the deliverable supply of the commodity should be measured by the amount that shorts could have delivered by the close of the delivery period with prudent planning, not the amount actually delivered. Second, the Court supposedly overlooked the absence of allegations demonstrating Defendants knew there was a shortage of the deliverable supply at the time they purchased their long positions. In the December 20 Memorandum & Order, the Court repeatedly explained it could not weigh facts on a Rule 12(b)(6) Motion, and it must draw all reasonable inferences in favor of Plaintiffs, even if Defendants argue the inferences or facts put forth by Plaintiff are improbable. Defendants' request for reconsideration on this claim is nothing more than a thinly-veiled attempt to lure the Court into fact finding, yet again, at an inappropriate stage of this litigation. And yet again, the Court refuses to do so.

As to the first argument that the deliverable supply of the commodity should be measured by the amount that shorts could have delivered by the close of the delivery period with prudent planning, the Court unquestionably acknowledged and discussed, at length, the "prudent planning" obligation of shorts in its Order. (See Mem. & Order 22-23.) By virtue of their argument, Defendants are prodding the Court to make a *factual determination* as to what constitutes "prudent planning" by a short under the market conditions in 2011. In fact, Defendants used the same strategy in their initial Motion, and the Court withheld making such a determination, specifically noting Defendants' argument would be better suited at a later stage in this case. (Id. at 24 n.11.)

Contrary to Defendants' position, Plaintiffs' allegations raise a reasonable inference that even with prudent planning the *deliverable* supply of cotton would have been inadequate to satisfy Defendants' long positions by the close of the delivery period. Plaintiffs allege a shortage in the deliverable supply of certificated cotton would have required them to begin moving non-certificated cotton by March 11, 2011 to accommodate the nine-week certification period. (Second Con. Am. Compl. ¶ 31(f).) Importantly, Plaintiffs also allege traders typically roll out of their positions about a month before delivery is expected. (Id. ¶¶ 50, 51; Mem. & Order 32 n.14.) Since the period during which traders began to roll into the next contract allegedly did not occur until the end of March or April for the May 2011 Contract, it would have been too late for shorts to begin moving cotton into the Exchange-approved warehouses and have it certificated in time for delivery. Plaintiffs, at this time, are entitled to the reasonable inference that, due to these facts, even with prudent planning, there was an inadequate deliverable supply.

Defendants' second argument is equally anemic. They maintain there are no allegations showing they knew there was a shortage of the deliverable supply when they purchased their

4

long positions. Specifically, Defendants claim there are no allegations demonstrating their knowledge of the number of non-certificated bales in route to Exchange-approved warehouses that could be certificated and later become available for delivery. Although Plaintiffs do not state that Defendants knew the amount of "in-transit" cotton (and even if they, did such a statement would be conclusory), Plaintiffs provide sufficient facts leading to a reasonable inference that this knowledge could be imputed to Defendants.

For example, working backwards, Plaintiffs claim Last Notice Day – the last day certificated cotton could be delivered in satisfaction of the May 2011 Contract – was May 13, 2011. (Second Con. Am. Compl. ¶ 31(f).) Once "in transit" cotton arrived at an Exchange-approved warehouse, it took "more than two weeks" to certificate during the relevant time period. (Id. ¶ 31(e).) Thus, any "in transit" cotton would have needed to begin certification in an Exchange-approved warehouse in April to be certificated in time for Last Notice Day. Plaintiffs further allege Defendants added to their long positions in April, though the specific dates are unknown, (id. ¶¶ 47, 52(a)), and during this time, Defendants had access to, and did know about, reports stating the number of bales awaiting certification. (Id. ¶ 31(i).) It is therefore plausible that, when Defendants *added to* their long positions, they knew the number of bales located in Exchange-approved warehouses waiting to be certificated. Any "in transit" cotton, *at that point*, outside Exchange-approved warehouses, would not have been certificated in time for delivery.

The Court is acutely aware that the Second Consolidated Amended Complaint ("SCAC") lays out a very complicated (and at times, murky) theory of manipulation, where the timing of events and specific facts are critical to Plaintiffs' claims. Should certain facts be discovered, they would inflict a swift, fatal blow on Plaintiffs' case. Indeed, even at this early stage in the litigation, Defendants' theories and facts seem significantly more probable as explanations for

5

what occurred in the cotton futures market in 2011. But, the Court would be abdicating its duty to afford Plaintiffs' the presumptions they are entitled to on a Rule 12(b)(6) Motion if it chooses Defendants' facts and inferences over Plaintiffs', not matter how enticing they may be. This Court adheres to the mandate of the Second Circuit that "[a] court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." Anderson News, LLC v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). Defendants would be better served reserving their fact-intensive arguments for summary judgment, when the Court may appropriately be persuaded by the portrait they present.

**C.** *Sherman Act Section 1 Claim*

Defendants seek reconsideration of this count by arguing the Court did not evaluate Plaintiffs' allegations under Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984). In the December 20 Memorandum & Order, the Court frequently cited to American Needle, Inc. v. National Football League, 560 U.S. 183 (2010), which is the most recent case in the Copperweld progeny and relies heavily on the reasoning in Copperweld. Nevertheless, the Court uses this opportunity to clarify its previous ruling on the § 1 claim.

The Supreme Court's decision in Copperweld marked a decline in the "intra-enterprise" conspiracy doctrine and the Court's focus on substance over corporate form. Yet, the holding of Copperweld was narrowly drawn: "We limit our inquiry to the narrow issue squarely presented: whether a parent and *its wholly owned subsidiary* are capable of conspiring in violation of § 1 of the Sherman Act. We do not consider under what circumstances, if any, a parent may be liable for conspiring with an affiliated corporation it does not completely own." 467 U.S. at 767

6

(emphasis added). Therefore, when lower courts are faced with the question of whether an affiliated, but not wholly owned, corporation can conspire with its parent in violation of § 1, they must draw from the analysis in Copperweld without the benefit of a bright line rule.

In holding "the coordinated behavior of a parent and its wholly owned subsidiary falls outside the reach of [§ 1,]" id. at 776, the Copperweld Court reasoned, "A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." Id. at 771. This "complete unity of interest" means "there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny." Id.

American Needle explicitly acknowledged and reinforced the principles set forth in Copperweld:

> Considering it 'perfectly plain that an internal agreement to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police,' we held that a parent corporation and its wholly owned subsidiary 'are incapable of conspiring with each other for purposes of § 1 of the Sherman Act.' We explained that although a parent corporation and its wholly owned subsidiary are 'separate' for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking and they control a single aggregation of economic power. Joint conduct by two such entities does not 'depriv[e] the marketplace of independent centers of decisionmaking,' and as a result, an agreement between them does not constitute a 'contract, combination . . . or conspiracy' for the purposes of § 1.

560 U.S. at 194 (internal citations omitted). Still relying on Copperweld, the Court expounded,

> [T]he question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged 'contract, combination . . ., or conspiracy' is concerted action — that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is

7

whether there is a 'contract, combination . . . or conspiracy' amongst 'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking,' and therefore of 'diversity of entrepreneurial interests,' and thus of actual or potential competition.

Id. at 195 (internal citations omitted). In sum, "[b]ecause the inquiry is one of competitive reality, it is not determinative that . . . two legally distinct entities have organized themselves under a single umbrella . . . . The question is whether the agreement joins together 'independent centers of decisionmaking.' If it does, the entities are capable of conspiring under § 1 . . . ." Id. at 196 (internal citation omitted).

The question for this Court is whether, based on the allegations in the SCAC, Defendants are incapable of conspiring under § 1 as a matter of law. Plaintiffs set forth the following facts with respect to the corporate relationship between Defendants:

(1) "Defendant Louis Dreyfus Commodities B.V. (sometimes herein, 'LDC') trades and markets commodities, including cotton, on an international basis." (Second Con. Am. Compl. ¶ 12);

(2) "Defendant Allenberg Cotton Co. ('Allenberg') is the name by which Defendant LD Commodities Cotton LLC a/k/a Allenberg Cotton Co., is doing business. Allegations herein relating to Allenberg are also allegations against LD Commodities Cotton LLC which is, directly or indirectly, a wholly owned division or subsidiary of LDC or another Defendant, and is one of the largest cotton merchandising organizations in the world." (Id. ¶ 13(a));

(3) "Claude Ehlinger is the executive vice president LDC Holding Inc. and the chief financial officer of Defendant Louis Dreyfus Commodities B.V. Defendant LDC Holding Inc. is, directly or indirectly, owned and controlled by Defendants Louis Dreyfus Commodities B.V. and owns and controls, directly or indirectly, Defendant LD Commodities Cotton LLC a/k/a Allenberg Cotton Co." (Id. ¶ 13(c));

(4) "Defendant Term Commodities, Inc. is a subsidiary of LDC. . . . Term Commodities does not act for public customers. It acts for the other Defendants and their affiliates." (Id. ¶ 14);

(5) "Defendant Louis Dreyfus Commodities LLC is a holding company for various operating companies engaged in the North American business with the Louis Dreyfus Commodities group of companies." (Id. ¶ 15);

8

(6) "Joseph Nicosia . . . was the Chief Executive Officer of Allenberg, at all times relevant herein, and handled the day-to day running of Defendant Allenberg, was the Senior Platform Head Cotton trader of the Louis Dreyfus Commodities Executive Group within Louis Dreyfus Commodities Holdings BV and LDC, and was and is a member of Louis Dreyfus Commodities' executive committee. Nicosia was also a manager of LDC Holding Inc." (Id. ¶ 16);

(7) "Almost all of the stopped deliveries for May and July were taken by a single clearing firm, Term Commodities which is owned by other Defendants. Plaintiffs have good grounds to believe and do allege that Term was working for and on behalf of the Defendants." (Id. ¶ 44(a));

(8) "Each Defendant acted in whole or in part through Defendant Term Commodities, Inc. and/or by virtue of each Defendant's ownership of, control over, directions to, or conduct in concert with Defendant Term Commodities, Inc. Defendants intentionally manipulated and artificially inflated May 2011 Contract prices and July 2011 Contract prices." (Id. ¶ 137(a));

(9) "Defendant Allenberg was a person acting on behalf of, and a person owned or controlled by Defendants Louis Dreyfus Commodities B.V., LDC Holding Inc. and Louis Dreyfus Commodities LLC." (Id. ¶ 141); and

(10) "Defendants undertook the activities alleged herein individually, in concert, and as one another's principal, control person, agent, or otherwise acting on behalf of one another within the meaning of Section 2(a)(1)(b) of the CEA, 7 U.S.C. §2(a)(1)(B)." (Id. ¶ 144.)

First, the Court rejects Defendants' unequivocal assertion that "Copperweld squarely holds that Section One claims are not viable where the only named coconspirators are a parent corporation and its subsidiaries." (Defs.' Reply Mem. 1.) This is an overstatement of the law. As explained earlier, Copperweld held a § 1 claim is not viable where the only named coconspirators are a parent corporation and its *wholly owned* subsidiaries. In their reply, Defendants seemingly concede Copperweld was limited to wholly owned subsidiaries, but they contend other courts have found "the Copperweld rationale also applies in situations between a parent and a less than wholly-owned subsidiary." (Id. at 2 (citations omitted).) Notably, none of the cases cited by Defendants are binding on this Court.

Notwithstanding the glaring deficiencies in these arguments, the Court is persuaded to reexamine the SCAC and determine whether based on Plaintiffs' allegations, Defendants were

9

legally capable of conspiring or combining in light of the reasoning in Copperweld and American Needle. Plaintiffs did not clearly plead Defendants' corporate relationships with one another. From the facts in the SCAC, however, the Court observes Defendant LDC is at the top of the corporate structure, serving as the parent corporation. (Second Con. Am. Compl. ¶ 12.) Defendants Allenberg Cotton Co. and LDC Holding Inc. are "directly or indirectly, a wholly owned division or subsidiary of LDC or another Defendant." (Id. ¶¶ 13(a), (c).) Defendant Term Commodities, Inc. "is a subsidiary of LDC[,]" though it is not specified whether it is a wholly owned subsidiary. (Id. ¶ 14.) Plaintiffs further allege "by virtue of each Defendant's ownership of, control over, directions to, or conduct in concert with Defendant Term Commodities, Inc.[,] Defendants intentionally manipulated" cotton futures prices. (Id. ¶ 137(a).) Defendant Louis Dreyfus Commodities LLC is a "holding company" for LDC, (id. ¶ 15), that purportedly "undertook the activities . . . individually, in concert, and as [the other Defendants'] principal, control person, agent, or otherwise acting on behalf of [the other Defendants]." (Id. ¶ 144.)

Even when viewing these allegations in the light most favorable to Plaintiffs, the Court cannot conclude they support a reasonable inference that Defendants have "separate corporate consciousnesses." Between LDC, Allenberg, and LDC Holding Inc., Plaintiffs openly allege a parent and wholly owned subsidiaries. Regarding the remaining corporations – Term Commodities, Inc. and Louis Dreyfus Commodities LLC – although they are not specifically labeled as wholly owned, the allegations portray the other Defendants as having "ownership" and "control over" them and giving "directions to" them. Nothing in the SCAC demonstrates a rational possibility that Defendants were "previously separate and competing entities [that combined] to act as one for their common benefit." Shaw v. Rolex Watch, U.S.A., Inc., 673 F. Supp. 674, 677-78 (S.D.N.Y. 1987). To the contrary, accepting Plaintiffs' allegations as true,

10

Defendants simply cannot be reasonably perceived as "separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." Copperweld, 467 U.S. at 769; see also Gucci v. Gucci Shops, Inc., 651 F. Supp. 194, 197 (S.D.N.Y. 1986) (finding where Defendants were under common ownership, all of the shareholders of one Defendant were beneficial owners of the other Defendant, and both Defendants were controlled by the same individuals, Defendants were incapable of conspiring with each other as a matter of law).

Lastly, the allegations that the corporate Defendants conspired with Defendant Nicosia are equally problematic. According to Plaintiffs, "Nicosia . . . was the Chief Executive Officer of Allenberg, at all times relevant herein, . . . the Senior Platform Head Cotton trader of the Louis Dreyfus Commodities Executive Group within Louis Dreyfus Commodities Holdings BV and LDC, and was and is a member of Louis Dreyfus Commodities' executive committee." (Second Con. Am. Compl. ¶ 16.) "[I]t is well-settled that a corporation's employees cannot conspire with their employer under section 1 of the Sherman Act." Gucci, 651 F. Supp. at 197 (quoting Schwimmer v. Sony Corp. of Am., 677 F.2d 946, 953 (2d Cir. 1982)); see also Copperweld, 467 U.S. at 769 ("[O]fficers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy."). Consequently, Nicosia, as an executive employed by several of the Defendant corporations, cannot legally conspire with those corporations pursuant to a § 1 claim.[1]

---

[1] Insofar as Plaintiffs attempt to rely on completely unidentified, unnamed coconspirators to circumvent Copperweld and American Needle, such allegations would not provide the minimum factual content required to plead a § 1 claim. See, e.g., Heart Disease Research Found. v. Gen. Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972) ("[A] bare bones statement of conspiracy . . . under the antitrust laws without any supporting facts permits dismissal. This is particularly true when, as here, the . . . plaintiff has already amended his complaint once with the approval of the court." (internal citation omitted)); Tese-Milner v. Diamond Trading Co., Ltd., No. 04 Civ. 5203 (KMW), 2011 WL 4501336, at *5 (S.D.N.Y. Sept. 29, 2011), overruled on other grounds by W.B. David & Co., Inc. v. De Beers

11

In light of the foregoing, the Court finds reconsideration of the § 1 claim is necessary to prevent manifest injustice, as the allegations in the SCAC show Defendants are legally incapable of conspiring or combining with each other. Upon thorough reconsideration, Plaintiffs' third cause of action for violations of § 1 of the Sherman Act is hereby dismissed.

**D.** *Sherman Act Section 2 Claim*

For the § 2 claim, Defendants argue the Court erred in failing to apply the pleading requirements set forth in Weyerhaeuser Co. v. Ross–Simmons Hardwood Lumber Co., Inc., 549 U.S. 312 (2007). Defendants assert the SCAC characterizes Plaintiffs' antitrust injury as artificial prices due to overpayments by Defendants, and this theory of injury is subject to the Weyerhaeuser framework. (Defs.' Mem. 10.) In the December 20 Memorandum & Order, the Court included a substantial discussion of Weyerhaeuser and expressed its skepticism about the applicability of Weyerhaeuser to this case. In its reasoning, the Court observed another decision, In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation, 767 F. Supp. 2d 880 (N.D. Ill. 2011), which found the Weyerhaeuser framework was inapposite to the antitrust injury alleged in that case. Defendants seek reconsideration on the grounds that it was inappropriate for the Court to rely on Dairy Farmers because it presented a new theory of antitrust injury that was not alleged, and Weyerhaeuser clearly governs the allegations in this case.

The real question presented by Defendants is where Plaintiff's allegations of antitrust injury are artificially high prices to offset their short positions caused by Defendants'

---

Centenary AG, 507 F. App'x 67, 69 (2d Cir. 2013) ("A well-pleaded complaint should include specific, factual allegations as to 'the identities of the co-conspirators, the nature of their conspiracy, . . . and what overt acts . . . they performed . . . .'" (citation omitted)); Garshman v. Universal Res. Holding Inc., 824 F.2d 223, 230 (3d Cir. 1987) ("[U]nspecified contracts with unnamed other entities . . . does not meet the minimum standards of pleading a conspiracy in violation of the Sherman Act.").

overpayment for long positions, can those allegations support an antitrust injury without Plaintiffs claiming a predatory bidding scheme. Plaintiffs plead their antitrust injury as:

> The Defendants' restraint of trade and anticompetitive conduct had severe adverse consequences on competition and price discovery. Plaintiffs and other members of the Class were deprived of normal, competitive trading patterns. Instead, they were subjected to artificially determined prices and price trends as a direct, foreseeable and intended result of Defendants' unlawful and manipulative conduct. As a consequence thereof, Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

(Second Con. Am. Compl. ¶ 135.) Defendants, without citation to any cases aside from Weyerhaeuser itself, claim the anticompetitive conduct at issue – Defendants overpaying for their long positions – which led to the injury at issue – Plaintiffs paying the resulting artificially high prices to offset – should be analyzed as a claim for predatory bidding.[2]

To be clear, the Court previously found that the anticompetitive conduct alleged in the SCAC was more than just Defendants' overpayment for their long positions:

> The facts set forth in the SCAC allege anticompetitive conduct by Defendants, describing an intentionally manipulative trading strategy to raise the prices of cotton futures in order to profit from their long positions. (Second Con. Am. Compl. ¶ 52(u).) Plaintiffs also claim Defendants acquired dominant long positions and demanded delivery even though their needs for physical cotton could have been satisfied more cheaply in the cash markets. (Id. ¶ 56.)

(Mem. & Order 42-43.) The allegations describe an extensive, manipulative trading strategy, whereby Defendants would have to overpay for cotton futures, add to their long positions to continue to drive up prices, refuse cotton from the cash market, and stand for delivery. True,

---

[2] Defendants go so far as to state, "Paying too much for a good could potentially be an antitrust violation *only* if it is part of a predatory scheme designed 'to drive competitors out of business.'" (Defs.' Mot. to Dismiss Mem. 21 (emphasis in original).) To support this proposition, they cite only to Weyerhaeuser. But, the portion of Weyerhaeuser from which Defendants quote states nothing about overpayment for goods. Rather, the Court is discussing the nature of predatory pricing, where "the predator reduces the sale price of its product (its output) to below cost, hoping to drive competitors out of business. Then, with competition vanquished, the predator raises output prices to a supracompetitive level." Weyerhaeuser, 549 U.S. at 318.

13

Plaintiffs claim Defendants paid inflated prices for their long positions, but Plaintiffs allege several other facets of anticompetitive conduct that purportedly caused their injuries.

Defendants claim these allegations fit neatly into a predatory bidding analysis: "[T]hat is exactly what Plaintiffs are alleging: that Defendants inflated input prices (in this case, cotton) in order to force competing purchasers of the input (like Plaintiffs) out of the market." (Defs.' Mot. to Dismiss Reply Mem. 11.) The Court disagrees, particularly in light of the lack of authority Defendants have cited to support the broad propositions they assert. Weyerhaeuser dealt with clear allegations of predatory bidding, where the parties to the suit were competitors, each manufacturing a tangible, output product that required the purchase of certain inputs. The anticompetitive conduct alleged resulted in injury to competition for purchasing the inputs required to manufacture the output-product, not to consumers. See Weyerhaeuser, 549 U.S. at 324-25 ("[P]redatory bidding presents less of a direct threat of consumer harm . . . . [A] predatory-bidding scheme could succeed with little or no effect on consumer prices because a predatory bidder does not necessarily rely on raising prices in the output market to recoup its losses. Even if output prices remain constant, a predatory bidder can use its power as the predominant buyer of inputs to force down input prices and capture monopsony profits." (internal citation omitted)).

Moreover, in this case, Defendants were not hoping to drive Plaintiffs out of the market. Indeed, the opposite is true; Defendants wanted Plaintiffs to participate in the market and continue to bid-up the prices to offset their short positions. The Court found these differences meaningful in rejecting Weyerhaeuser as controlling the allegations in this case. The reliance on Dairy Farmers merely demonstrated sound reasons why Weyerhaeuser may not be applicable.

14

The Court did not change Plaintiff's theory of the case or suggest the anticompetitive conduct and resulting injuries alleged here are identical to the plaintiffs in Dairy Farmers.³

To the extent Defendants are arguing the differences in the allegations between this case and a predatory bidding case, such as Weyerhaeuser, are inconsequential, the Court is not persuaded. Defendants are correct to point out that Weyerhaeuser makes clear there are many procompetitive reasons a firm may overpay for a good. One such reason is particularly relevant to the commodities trade: "[A] firm might bid up input prices to acquire excess inputs as a hedge against the risk of future rises in input costs or future input shortages." Id. at 323. But, as discussed earlier, Plaintiffs set forth significantly more facts implicating anticompetitive conduct than simply overpayment for an input. Further, "[a]lthough Plaintiffs may have sought to compete with Defendants in buying cotton futures, their injury, too, resulted from the inflated price of cotton as dictated by Defendants' influence over futures prices, 'not their inability to compete in the manufacture and sale of some output[.]'" (Mem. & Order 45 (citation omitted).) These allegations present a distinct theory from the predatory bidding in Weyerhaeuser.

Defendants advocate for the application of Weyerhaeuser because they claim Plaintiffs have not pled the second-prong of a § 2 claim advanced under a theory of predatory bidding – that "the alleged predator had 'a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power.'" (Id. at 43 (citation omitted).) Yet, in attempting to apply *both prongs* of the predatory bidding framework, it

---

³ Defendants' suggestion that they were denied due process when the Court's opinion cited to a case that was not raised in the briefing approaches absurdity. Defendants argued Weyerhaeuser requires that Plaintiffs comply with certain pleading requirements, and they failed to do so. In rejecting that argument, the Court explained why Weyerhaeuser was not dispositive of Plaintiffs' § 2 claim. That the Court cited to Dairy Farmers, a case not submitted in the parties' briefs, to bolster and help elucidate its reasoning can hardly be said in good faith to resolve the motion "based on an issue never raised." (See Defs.' Mem. 9); c.f. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

15

becomes even more apparent such framework is not applicable to this case. The first prong "requires proof that: . . . 'the predator's bidding on the buy side must have caused the cost of the relevant output to rise above the revenues generated in the sale of those outputs'[.]" (Id. (citation omitted).) Defendants' characterize the "buy side" or "inputs" as "cotton." (Defs.' Mot. to Dismiss Reply Mem. 11.) Momentarily taking that assertion as true, it is painfully unclear how the Court could determine whether Defendants' bidding for cotton, or perhaps cotton futures, caused the cost of the relevant output, which is non-existent, to rise above revenues generated in the sale of those outputs. The unworkable analysis created by the Weyerhaeuser framework, combined with a conspicuous absence of case law providing support for their position,[4] simply reinforces the Court's determination that the allegations in this action do not equate to predatory bidding.

### V.     Conclusion

For the reasons discussed herein, Defendants' Motion for Reconsideration is **GRANTED IN-PART** and **DENIED IN-PART**. Plaintiffs' third claim under § 1 of the Sherman Act is **DISMISSED**. Given the delicate factual balance in which Plaintiffs' remaining claims hang, the Court will strictly define the parameters of any additional discovery needed at this time and grant Defendants leave to make a Motion for Summary Judgment, if they so choose, before entertaining any Motion by Plaintiffs for Class Certification.

---

[4] In the Court's own research, it has found few cases that interpret the applicability of Weyerhaeuser to allegations that are not clearly part of a predatory bidding theory. In one such case, while the allegations of anticompetitive conduct and injury are plainly different from this case, the court found Weyerhaeuser was distinguishable on the facts and the procedural posture. See generally Nexstar Broad., Inc. v. Granite Broad. Corp., No. 1:11 Civ. 249, 2012 WL 4794380, at *1 (N.D. Ind. Oct. 9, 2012).

The Court will hold a status conference on **October 21, 2014 at 11:00 a.m.** The parties shall appear in-person at the Thurgood Marshall United States Courthouse, 40 Foley Square, Courtroom 1306 at the above listed date and time.

The Clerk of Court is respectfully directed to terminate the Motion at Dkt. No. 82.

**SO ORDERED.**

Dated:    New York, New York
                September 30, 2014

                                            **ANDREW L. CARTER, JR.**
                                            **United States District Judge**